# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON

Assigned on Briefs August 7, 2012

## STATE OF TENNESSEE v. JACKSON MARTIN

**Direct Appeal from the Criminal Court for Shelby County**
**No. 10-07889     Mark Ward, Judge**

**No. W2012-00144-CCA-R3-CD  - Filed February 1, 2013**

A Shelby County Criminal Court Jury convicted the appellant, Jackson Martin, of attempted second degree murder and two counts of carjacking. After a sentencing hearing, the trial court merged the carjacking convictions and sentenced him to an effective sentence of twenty-two years in confinement. On appeal, the appellant contends that (1) the trial court erred by commenting to the jury about his failure to present alibi witnesses; (2) the trial court erred by refusing to give the jury an alibi instruction; and (3) the evidence is insufficient to support the convictions. Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed**.

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, and ROGER A. PAGE, JJ., joined.

Barry W. Kuhn (on appeal) and Constance J. Barnes and Vincent Ores (at trial), Memphis, Tennessee, for the appellant, Jackson Martin.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Robert William Ratton, III, and Jessica Banti, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

The victim, Bendell "Slick" Jackson, testified at trial that he was a drug dealer. On July 21, 2010, he planned to sell drugs to the appellant, whom he knew as "Jack," and picked

up the appellant from the Studio Plus Hotel on Old Dexter Road. The appellant told the victim that he needed to get money from an ATM, so the victim drove him to the Exxon on Germantown Road. The appellant went into the gas station, came out, and got back into the car. The victim asked if the appellant got the money, and the appellant said yes. The victim said he knew the appellant did not have any money because "I seen him [walk] in and [walk] straight back out." The victim said he told the appellant, "'Well, I'm going to go on and drop you off because I know you ain't got the money.'" The appellant tried to assure the victim that he had the money to buy the drugs.

The victim testified that he drove back to the hotel and tried to get the appellant to get out of the car. The appellant said he had the money, reached into his pocket, pulled out a knife, and started stabbing the victim. The victim put up his arm and tried to get out of the car, but his seatbelt was on. He opened the door while the car was still moving and was hanging out of the car. He got back into the car, unhooked the seatbelt, and fell onto the street. The appellant saw the victim still moving, got out of the car, and approached the victim with the knife. The victim said he heard someone say, "'What are you doing[?]'" The appellant looked at the person, looked at the victim, got into the car, and drove away. The victim saw an elderly couple, told them to call 911, and collapsed.

The victim testified that the appellant stabbed him twelve to fourteen times. At first, the victim did not identify the appellant as his attacker because he did not want anyone to know he was selling drugs. However, a police officer told him at the scene that he probably would not live, so he decided to tell the officer about the appellant. Paramedics took the victim to The Med, where he spent eight days and had two major surgeries. The day after the stabbing, a police officer showed him a photograph array, and he identified the appellant's photograph. About two weeks after he was released from the hospital, he told Sonja Torkell, the appellant's girlfriend, that the appellant stabbed him. He acknowledged that he gave several different versions of the events and said that he changed his story about why the appellant stabbed him because he was on probation and afraid. He acknowledged that drug charges were pending against him but said that the State had not made him any offers in exchange for his testimony.

On cross-examination, the victim testified that at the time of the stabbing, he had been selling drugs to the appellant for more than six months and that Torkell also was a regular customer. He denied that Torkell "turn[ed] tricks" for him in exchange for drugs. On the day of the stabbing, the victim was driving his girlfriend's Nissan Sentra, a small car. After the stabbing, the victim was bleeding profusely, and blood should have been on the appellant. The victim had never sold drugs to the appellant at the hotel on Old Dexter Road prior to July 21, 2010, and he usually did not sell drugs in that neighborhood. The victim denied that two other drugs dealers stabbed him on July 21 in retaliation for his selling drugs on their "turf."

He acknowledged that in his prior stories about the stabbing, he claimed that the appellant owed him money. He acknowledged that he gave four previous versions of the events and that he told his girlfriend, "'I hope after [the appellant's] trial is over I get that last case dismissed.'" He denied asking the State for help with his pending charges and stated, "I just wish somebody would have sympathy for me. I'm not expecting nothing. . . . I can take care of my other cases myself, you know, if nothing don't happen, you know. I just want justice done."

Sonja Torkell testified that she and the appellant ended their relationship on July 3, 2010. On July 21, 2010, Torkell was working as a stylist at a hair salon. About 4:00 p.m., the appellant came into the salon, and Torkell gave him a haircut. Afterward, the appellant said he had to cash his paycheck in order to pay for the haircut. About one and one-half hours later, he returned to the salon, put a plate of food in Torkell's station, and left. He still had not paid for the haircut. Later, the appellant telephoned Torkell at the salon. She said that he was very emotional, that he kept telling her he did not want her to hate him, and that he said he was "sorry . . . about a lot of different things." Torkell told the appellant that she had to get back to work. About fifteen minutes later, the appellant telephoned Torkell for a second time and asked for "Slick's" telephone number. Torkell gave it to him and did not hear from him again. She said the appellant carried a pocketknife "[p]retty much most days, yeah, to work."

On cross-examination, Torkell testified that the pocketknife was five to six inches long unopened. She acknowledged that the victim sold drugs to her and that she had a relationship with him prior to her relationship with the appellant. She denied exchanging sex for drugs with the victim and said she had not bought drugs from him since he had been released from the hospital. She denied hating the appellant and said the victim sold drugs to him at the hotel one time prior to July 21, 2010.

Sergeant Andre Pruitt of the MPD testified that on July 22, 2010, he went to The Med and spoke with the victim, who had at least eight stab wounds. A suspect had been developed in the case, and Sergeant Pruitt showed the victim a photograph array. The victim identified the appellant as the person who stabbed him. On cross-examination, Sergeant Pruitt testified that he did not know if the victim was on medication at the time of the identification. On redirect examination, Sergeant Pruitt testified that the victim had had surgery the previous night but that the victim was able to give him a statement and tell him what happened on July 21.

Audrey Hart testified that at 6:30 p.m. on July 21, 2010, she was outside watering her flowers and heard someone yell for help. She said she saw a young African-American male with "blood all down him" pacing back and forth. Hart called 911. The victim collapsed,

and Hart tried to get information from him to give to the 911 operator. The victim told Hart that he had been stabbed and carjacked. Hart did not ask the victim to identify his attacker. On cross-examination, Hart testified that she did not see the victim get out of a car or a white male with a knife chase the victim.

Officer Michael Chapman of the MPD testified that about 6:45 p.m. on July 21, 2010, he was dispatched to the scene. He saw an African-American male lying on the street in a pool of blood and people administering first aid. Officer Chapman spoke with the victim, who was reluctant to give him any information. Officer Chapman saw a large cut and a gaping wound on the victim's neck and multiple stab wounds on the victim's right side. He thought the victim was going to die. He told the victim that the victim may die and that the victim needed to tell the police what happened. The victim began talking about the stabbing.

Officer Hope Smith of the MPD testified that she responded to the stabbing. She said that the victim was lying on a stretcher and that he was "cut up and bandaged." Blood droplets, a blue baseball cap, a t-shirt, a pair of gym shoes, and a brown belt were on the street. Blood was on all of the clothing.

Sergeant James Woods of the MPD testified that on July 22, 2010, he responded to a call about a car on fire in the Covington Pike Bottoms, a place where people rode four-wheelers. He arrived at the scene about 8:00 a.m. He said the car was in the woods about one-quarter mile off a dirt trail and was "burnt out."

On cross-examination, Sergeant Woods testified that a Nissan emblem was on the ground. He acknowledged that he did not know who drove the car into the woods.

Officer David Galloway of the MPD testified that on July 22, 2010, he went to the Covington Pike Bottoms. He photographed the burned car and collected its "VIN plate."

Sergeant John Simpson of the MPD testified that he was the coordinator for this case and arrived at the scene of the stabbing about 8:00 p.m. on July 21. The victim had been airlifted to The Med. Sergeant Simpson viewed evidence and followed a blood trail on the street to a large blood stain where the victim had collapsed. The officer spoke with witnesses and took their statements. Through his investigation, he learned about the car the victim had been driving and broadcast a BOLO, be-on-the-lookout, for the vehicle. He also entered the car into the NCIC, a national database.

Sergeant Simpson testified that he went to The Med and checked on the victim. The next morning, he learned that the victim's girlfriend's car had been found in the Covington Pike Bottoms and went to the scene. He also spoke with the victim's girlfriend. Then he

went to the Studio Plus Hotel and arrested the appellant as he was coming out of his room. The appellant had fresh burn marks on his arms and legs and dirt on his legs. Due to the blistering on the appellant's legs, he was transported to The Med for treatment. Sergeant Simpson said the appellant was "high on some kind of drug." The appellant told the officer that he had been staying at the Studio Plus for about two months, was a drug user, had lost his job, and had just received his last paycheck. The appellant also told Sergeant Simpson that he did not have a car. However, Sergeant Simpson found a receipt for five dollars worth of gasoline purchased by the appellant at 8:41 p.m. on July 21, 2010. Sergeant Simpson said the appellant was the only suspect in the case.

On cross-examination, Sergeant Simpson testified that other officers executed a search warrant for the appellant's hotel room. They did not find any bloody clothes or a knife. Sergeant Simpson did not find any physical evidence linking the appellant to the crimes, and the appellant was not covered in dirt and mud at the time of his arrest. Sergeant Simpson asked the appellant how he got the blisters on his legs, but the appellant did not tell him.

On redirect examination, Sergeant Simpson testified that on July 26, 2010, he went to the Exxon gas station where the appellant reportedly visited the ATM and viewed the store's video surveillance. The video showed the appellant enter the store and go to the ATM. The appellant stood at the ATM for about one minute and appeared to use the machine. Sergeant Simpson said that a power outage at the store erased the video before the police could copy it and that the victim never changed his story about who stabbed him. At the conclusion of Sergeant Simpson's testimony, the State rested its case.

James Bratton testified for the appellant that about 7:00 p.m. on July 21, 2010, he was visiting Laverne Long at her home in a subdivision off Old Dexter Road. Bratton and Long were standing in Long's yard when Bratton heard a commotion. He said he looked and saw the victim "get pushed away from the car or dumped out of the car." Bratton said the victim ran toward Long's home and yelled, "'I've been stabbed, I've been stabbed.'" The victim collapsed. Bratton asked who stabbed him, but the victim did not tell him. Bratton said that he saw at least one other person in the car and that the car sped away. He did not see a white male get out of the car and chase the victim.

On cross-examination, Bratton testified that he was eighty-six years old. He said he could read a newspaper but did not see objects far away as well as he saw them close up. However, he stated, "I have better than average eyesight for my age." He said that when he first saw the victim, the victim was about forty to fifty yards away and was walking toward him. He acknowledged that he did not see the victim get out of the car and that he was just assuming someone pushed the victim out of the car.

The appellant testified that he did not stab the victim or set the victim's girlfriend's car on fire. At the time of the stabbing, the appellant had been buying drugs from the victim for about six months. He said he and the victim usually met "out by the interstate or at McDonald's." On July 21, 2010, the appellant's car was being repaired, so he could not meet the victim as usual. The victim came to the hotel where the appellant was staying, and they met outside. The appellant asked the victim to take him to an ATM. The victim drove the appellant to the Exxon station, and the appellant got $200 out of the machine. He said that he had been drinking and taking Xanax and that he did not remember what time he left the hotel with the victim.

The appellant testified that he and the victim returned to the hotel and that the victim sold him crack cocaine inside the car. Then the appellant went to his room while the victim went to the swimming pool to sell drugs. The appellant said he used the crack cocaine with "a couple of people from out of town staying at the hotel." Later, he went with them to a home in Collierville. The appellant said that the woman who owned the home was not there, so they stayed about one hour and then "rode around and partied" for most of the night. At some point, they returned to the hotel and sat around the pool for about one hour. He said that he did not remember the names of the people he was with on the night of July 21 and that "I can't really tell you exactly what we did or what time we came and went." The next morning, the appellant's son took him to Walmart. His son dropped him off at the hotel about 11:00 a.m., and the police arrested him as he was returning to his room. He said he told Sergeant Simpson he had been drinking alcohol and using drugs on the night of July 21. He said that he had a prior conviction for aggravated assault and that he kept a knife, about six inches long, with him when he was working because he used the knife for construction jobs.

On cross-examination, the appellant testified that he did not see the victim sell drugs to anyone at the pool. The appellant left the hotel and went to Collierville with two men, who were brothers. He said that he did not know what time he left with them or their names but that they were from Georgia and were staying at the hotel while they worked for a guardrail company. At the time of his arrest, the appellant had burns on his legs but not on his arms. He said the burns resulted from a "cooking accident" on July 21 that occurred before he took food to Sonja Torkell. Specifically, boiling water and butter spilled on his legs while he was cooking shrimp. The appellant did not have a knife on his person when he was arrested, and he did not remember where his knife was at the time of his arrest.

The jury convicted the appellant as charged of attempted second degree murder and two counts of carjacking, Class B felonies. After a sentencing hearing, the trial court merged the carjacking convictions and sentenced the appellant to eleven years for each conviction to be served consecutively for an effective sentence of twenty-two years in confinement.

## II. Analysis

### A. Trial Court's Comment on the Appellant's Credibility

The appellant contends that the trial court erred by commenting to the jury about his failure to present alibi witnesses and that the trial court, in effect, improperly commented on his credibility. The State argues that the appellant is not entitled to relief because he late-filed his motion for new trial and that any error does not rise to the level of plain error. We conclude that the trial court erred but that the error does not warrant relief.

Before trial, the State filed a motion, demanding that the appellant notify the State of his intention to rely upon an alibi for the offense, which occurred at about 6:50 p.m. on July 21, 2010 at the intersection of Old Dexter and Town & Country. The appellant responded to the motion, stating that he did not intend to offer an alibi defense and that he would notify the State if an alibi defense developed.

At trial, the appellant testified that after he and the victim arrived back at the hotel, he went up to his room to use the crack cocaine he had bought from the victim. The victim went to the swimming pool to sell drugs. The appellant met up with two men, who were brothers staying at the hotel. On direct examination, he testified that he did not know what time he met them, but on cross-examination, he said, "The sun was going down, I believe. It was about dusk. It was dusk." He went to their room and then left with them. Later, the appellant put five dollars worth of gasoline in their truck. On cross-examination, the State asked, "So you don't remember the names of the people that could be your alibi witnesses here today?" Defense counsel objected, stating that "he has clearly testified he does not remember these people. It was asked on direct, and it was asked on cross, and this is the third time."

In a jury-out hearing, defense counsel also argued that the question was improper because the appellant "does not have to call any witnesses, and it's improper to imply to the jury that just because he took the stand that he has to also supply alibi witnesses to support what he's saying." The trial court answered,

> Well, I'm sitting here really struggling because the State put down a notice for alibi witnesses, and then this man gets up here and testified that he's got all of these alibi witnesses that he didn't bother to tell the State about so they could subpoena them to be here. . . . [S]o here the State gets ambushed with all these people that he could have answered in his notice of alibi so that they could have investigated and tried to have done something

-7-

with it and he [gets] up here on the stand and now you want to say he doesn't have to produce any witnesses?

. . . .

I can't prevent him from testifying, but he -- there's got to be some fairness to this process, and when he gets up here for the first time in the middle of the trial and says he's got alibi witnesses and he just testified under oath he could have found out the names of those people from Georgia. The records were probably available at the hotel.

The trial court disagreed with defense counsel's argument that the State's question shifted the burden of proof to the appellant and stated, "I'm going to overrule your objection. . . . And at some point, I think I have to instruct the jury that the State requested a notice of alibi[.] . . . I will read what the [appellant's] response was."

When the jury re-entered the courtroom, the trial court instructed it as follows:

This is a criminal case, and the Defendant does not have the burden or requirement to produce any witnesses, but both sides have the power to produce those witnesses if they should so choose.

The rule provides under Rule 12.1 that, "A District Attorney General who desires disclosure of potential alibi defense shall serve the Defendant with a request to be notified of an intention to offer an alibi defense. That request shall state the time, date and place at which the alleged offense was committed." So once the State makes this request and says when the alleged offense was committed, the Defense is required to issue a response.

. . . .

In this case, a notice was requested, and the response that was given by the Defense, if I can find it, . . . ["]that the Defendant does not intend to offer a defense of alibi. If a defense of alibi develops, Defendant Martin will promptly notify the State."

-8-

So in this case, there has been no notice of alibi given and no opportunity to investigate this from an alibi standpoint, and so that's all I am really going to tell you about this matter other than what I have already told you, that both sides have a right to subpoena and call witnesses, but there is no burden on the Defendant to call witnesses. There is a burden, though, under this rule to notify the State of potential alibi witnesses, so that's all I am going to say on the matter, and I'm going to let the lawyers continue their questioning of this witness.

After the instruction, the State resumed cross-examining the appellant.

Tennessee Rules of Criminal Procedure, Rule 12.1(a)(1) provides,

A district attorney general who desires disclosure of a potential alibi defense shall serve the defendant with a written request to be notified of an intention to offer an alibi defense. The request shall state the time, date, and place at which the alleged offense was committed.

A defendant who intends to offer an alibi defense shall inform the district attorney general, in writing, of the intention and must state "the specific place or places at which the defendant claims to have been at the time of the alleged offense" and "the name and address of each alibi witness on whom the defendant intends to rely." Tenn. R. Crim. P. 12.1(a)(2)(A)(i), (ii). If the defendant fails to comply with the Rule, the court may exclude the testimony of any undisclosed alibi witness offered by the defendant; however, the rule does not limit the defendant's right to testify. Tenn. R. Crim. P. 12.1(d).

As this court has explained,

The Tennessee Constitution prohibits judges from commenting on the evidence in a trial, but judges may "state the testimony and declare the law." Tenn. Const. art. VI, § 9. A trial judge is obligated to "be very careful not to give the jury any impression as to his feelings or to make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury." State v. Suttles, 767 S.W.2d 403, 407 (Tenn. 1989).

State v. Anthony Dewayne Hood, No. E2008-02298-CCA-R3-CD, 2010 Tenn. Crim. App.

LEXIS 750, **25-26 (Knoxville, Sept. 10, 2010).

Turning to the instant case, we can appreciate the trial court's concern about the appellant's trying to "ambush" the State. However, Rule 12.1, Tennessee Rule of Criminal Procedure, clearly states that a defendant's failure to notify the State of an alibi defense does not affect the defendant's right to testify. The trial court even commented during the jury-out hearing about the appellant's right to testify. Moreover, "[t]he purpose of cross-examination . . . is to give opposing counsel an opportunity to lessen the effect of a witness's testimony by involving him in inconsistencies or contradictory statements thereby impeaching his testimony." McBee v. State, 372 S.W.2d 173, 180 (Tenn. 1963). In this case, the State was zealously questioning the appellant about his inability to recall the names of the two men and the specific times he met them or left the hotel with them, severely attacking his credibility. While the trial court correctly instructed the jury that the appellant was under no obligation to present witnesses, we must agree with the appellant that the instruction could have been construed by the jury as a comment on the appellant's credibility.

Next, we will determine the effect of the error. As noted by the State, the appellant late-filed his motion for new trial. See Tenn. R. Crim. P. 33(b). A defendant's failure to file a timely motion for new trial deprives the defendant "of the opportunity to argue on appeal any issues that were or should have been presented in the motion for new trial." State v. Martin, 940 S.W.2d 567, 569 (Tenn. 1997). However, Tennessee Rule of Appellate Procedure 36(b) provides that "[w]hen necessary to do substantial justice, [this] court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Therefore, the appellant will be entitled to relief only if the trial court's error rises to the level of plain error. We may only consider an issue as plain error when all five of the following factors are met:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice.

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the "'"plain error" must be of such a great magnitude that it probably changed the outcome of the trial.'" Adkisson, 899 S.W.2d at 642 (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)).

Upon review of the record, we conclude that the trial court's error was not of such magnitude that it changed the outcome of the trial. The victim testified that the appellant stabbed him on the evening of July 21, 2010, and he identified the appellant in a photograph array shortly after the crimes and at trial. The victim never changed his story about the appellant's being his attacker. According to the victim, he drove the appellant to an ATM prior to the stabbing in order for the appellant to withdraw money to buy drugs. Sergeant Simpson testified that he viewed video showing the appellant entering the store and standing at the ATM machine, supporting the victim's version of the events. In addition, the appellant admitted being with the victim in the victim's girlfriend's car before the stabbing. The victim testified that after the stabbing, the appellant drove away in the car. The next day, the car was located, completely burned, in the woods. The appellant was arrested later that morning and had burn marks on his arms and legs that required medical evaluation at a hospital. Moreover, although the appellant did not have a car, a receipt showed he put gasoline into a vehicle after the stabbing, and a knife that the appellant was known to carry was never located. The State's proof against the appellant was strong. Therefore, we conclude that consideration of the error is not necessary to do substantial justice and that the appellant is not entitled to relief.

## B. Alibi Instruction

Next, the appellant contends that the trial court erred by refusing to give an alibi instruction. The State argues that an alibi instruction was not required in this case. As with the previous issue, this issue has been waived because the appellant late-filed his motion for new trial. In any event, we agree with the State. Therefore, the appellant is not entitled to plain error relief.

A defendant has a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Accordingly, trial courts "should give a requested instruction if it is supported by the evidence, embodies a party's theory, and is a correct statement of the law." State v. Phipps, 883 S.W.2d 138, 150 n.20 (Tenn. Crim. App. 1994). Moreover, we have previously noted that "[w]e must review the entire [jury] charge and only invalidate it if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995). A charge resulting in prejudicial error is one that fails to fairly submit the legal issues to the jury or misleads the jury about the applicable law. State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997).

This court has previously defined "alibi" as "'[a] defense based on the physical impossibility of a defendant's guilt by placing the defendant in a location other than the scene of the crime at the relevant time.'" State v. Looper, 118 S.W.3d 386, 416 (Tenn. Crim. App.

2003) (quoting Black's Law Dictionary 72 (7th ed. 1999)). A trial court must instruct the jury on the defense of alibi when it is "fairly raise[d]" by the proof. Manning v. State, 500 S.W.2d 913, 915 (Tenn. 1973). The defense of alibi has been said to have been fairly raised in three sets of circumstances:

> (1) where the defendant's alibi has been corroborated by other credible witnesses[;] (2) where the victim has been unable to identify the defendant[;] [or] (3) where the proof against the defendant is wholly circumstantial[.]

Id. at 916 (citations omitted.) The trial court is obligated to instruct the jury on alibi regardless of any request by the defendant. See Poe v. State, 212 Tenn. 413, 370 S.W.2d 488, 490-91 (Tenn. 1963). Failure to give an instruction constitutes reversible error. Id. at 490-91.

We conclude that the trial court did not err by failing to give an alibi instruction. The appellant could not provide a name for the brothers and did not remember what time he used drugs with them or left the hotel with them. The appellant's alibi was not corroborated by other witnesses, the victim identified the appellant as his attacker shortly after the stabbing and at trial, and the victim's testimony about the stabbing is direct evidence of the appellant's guilt. Therefore, we conclude that the defense of alibi was not fairly raised by the proof. Given that a clear and unequivocal rule of law was not breached, the appellant is not entitled to plain error relief. See Adkisson, 899 S.W.2d 626, 641-42.

C. Sufficiency of the Evidence

Finally, the appellant contends that the evidence is insufficient to support his convictions. For the attempted second degree murder conviction, the appellant argues, without any explanation, that the evidence fails to show he acted knowingly. For the carjacking convictions, the appellant does not explain why the evidence is insufficient. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the

evidence, are resolved by the trier of fact.  State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id.  Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient.  State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Second degree murder is the knowing killing of another.  Tenn. Code Ann. § 39-13-210(a)(1).  A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.  Tenn. Code Ann. § 39-11-106(a)(20).  Criminal attempt requires that one act "with the kind of culpability otherwise required for the offense . . . [and] with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part."  Tenn. Code Ann. § 39-12-101(a)(2).

Carjacking is defined as "the intentional or knowing taking of a motor vehicle from the possession of another" and can be accomplished by use of (1) a deadly weapon or (2) force or intimidation.  Tenn. Code Ann. § 39-13-404(a).  Count 2 of the indictment alleged that the appellant committed carjacking by use of a deadly weapon, and count 3 alleged that the appellant committed carjacking by use of force or intimidation.

Taken in the light most favorable to the State, the evidence shows that the victim drove the appellant back to the hotel and tried to get him to get out of the car.  The appellant pulled out a knife and began stabbing the victim.  The victim managed to unhook his seatbelt and fell onto the street.  The appellant got out of the car and walked toward the victim, but when someone called out to the appellant, the appellant got into the car and drove away.  We conclude that the State presented sufficient evidence for a jury to find beyond a reasonable doubt that the appellant knowingly stabbed the victim and that he intentionally took the vehicle from victim's possession by the use of a deadly weapon and force.

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE

-13-